## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 25-CR-23 (DLF) |
| | : | |
| v. | : | |
| | : | |
| DARON K. BROWN, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum to assist the Court's consideration of the relevant issues. As discussed further below, Defendant Daron Brown (herein referred to as "Brown" or "the defendant") faces an advisory Guidelines of 46 months to 57 months. For the reasons articulated below, the government respectfully recommends this Court impose a guidelines sentence of 51 months, to be followed by 36 months' supervised release.

## FACTUAL BACKGROUND

On Friday, January 10, 2024, members of the MPD's Robbery Suppression Unit were working the evening tour of duty. At 10:58 p.m. investigators observed a silver Volkswagen bearing DC tags (JM-2271) driving westbound on Florida Avenue, Northwest. Sergeant Scott Possinger saw the vehicle attempt to turn south on the 1900 block of 7th Street, Northwest, however, the vehicle failed to clear the intersection and was forced to obstruct the crosswalk due to traffic congestion.

After multiple attempts, investigators stopped the vehicle, and a man identified as Robert Williams exited the driver's seat of the vehicle and fled on foot. Investigators Arnone, Guzman, Possinger and Todd gave chase. During the chase, Williams ignored Investigator Todd's repeated

1

orders to stop.  Williams was eventually caught and arrested.

Back at the traffic stop, Brown stayed in the front passenger seat of the vehicle. Investigator Choi, who was in a separate car, exited his vehicle with his gun drawn and ordered Brown to exit the vehicle.   As Investigator Choi approached, he saw a gun on the front driver's seat where Williams had been sitting, later identified as a Glock, Model 23, .40 caliber semi-automatic pistol with serial number DVX608 loaded with one round in the chamber and 20 rounds in a 22-round high-capacity magazine.  *See* Figure 1.



*Figure 1: Glock 23, .40 Caliber with 22-round Magazine*

Investigator Choi then opened the front passenger door where Brown was sitting and pulled Brown out of the vehicle.  Brown had a blue coat in his lap that he placed on the seat as he was being pulled out of the car.  *See* Figure 2-3.  Once outside the vehicle, Brown appeared to comply, then attempted to run away but was eventually restrained.   Shortly thereafter, Officer Simeon Norfleet conducted a search of the vehicle and located a second gun with a Glock converter, giggle switch under the blue coat on the front passenger seat where Brown was sitting.  *See* Figure 4.

This gun was later identified as a Glock 21, .45 caliber semi-automatic firearm with serial number AELN436. The Glock 21 was loaded with one round in the chamber and an additional 11 rounds in a 13-round capacity magazine.



*Figure 2: Brown in Vehicle with Blue Coat on his Lap*



*Figure 3: Blue Coat on Front Passenger Seat*



*Figure 4: Second Gun with Giggle Switch*

3

Officer Todd searched Williams incident to his arrest which revealed 12 zips of a white, rocklike substance that was field tested but was inconclusive in Williams's jacket pocket. A further search revealed 44 multicolored pills that field tested positive for MDMA, otherwise known as ecstasy. *See* Figure 5.



*Figure 5: White Rocklike Substance & MDMA*

A search of the vehicle by Officer Norfleet revealed suspected PCP from a jacket pocket that was recovered from the driver's seat where Williams had been sitting. *See* Figure 6-7. The PCP was in a 2-ounce vial that was twenty-five percent full. *See* Figure 8. Additionally, six .40 caliber rounds of loose ammunition were recovered from the front driver's side compartment, as well as a bottle of alcohol from the center console.



*Figure 6: Jacket Recovered*



*Figure 7: 2 Ounce Vial of PCP*



*Figure 8: 2 ounce of PCP that was ¼ full*

Brown had been previously convicted of a crime punishable by imprisonment greater than one year in D.C. Superior Court in 2021 CF2 3214 for Unlawful Possession of a Firearm and Carrying a Pistol Without a License.

## **PROCEDURAL HISTORY**

On January 22, 2025, a federal grand jury returned a two-count indictment charging Brown and Williams with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. Both defendants were arrested on January 24, 2025, where they were arraigned. ECF Nos. 5, 6. On March 25, 2025, Brown pled guilty to one count of 18 U.S.C. § 922(g)(1). ECF No. 21.

Sentencing is scheduled for Thursday, August 14, 2025, at 11:30 am. The United States now submits this Memorandum in Aid of Sentencing.

## **LEGAL STANDARD**

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). While the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated."). These factors are in keeping with the traditional factors used by courts when imposing a sentence: (1) the protection of society against wrongdoers; (2) the punishment or discipline of the wrongdoer; (3) the reformation of the wrongdoer; and (4) the deterrence of others from the commission of like offenses. *See Spanziano v. Florida*, 468 U.S. 447, 477-78 (1984) (Stevens, J., concurring); *see also Williams v. New York*, 337 U.S. 241, 251 (1949).

The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness"). Further, similarly situated defendants should receive like punishments. *See* 18 U.S.C. § 3553(a)(6).

## SENTENCING GUIDELINES CALCULATIONS

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation. As noted:

> In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."

U.S.S.G. § 1B1.3, Commentary, Background.

Here, the parties do not dispute the offense level to be 17. ECF No. 21 (Plea Agreement), and the defendant's criminal history to be a Category V. The Presentencing Investigation Report ("PSIR") also endorses this guidelines range. ECF No. 29. Thus, the applicable guidelines range, as set forth below, is 46-57 months' imprisonment.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The crime at issue here merits a sentence of 51 months' incarceration. In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some factors this court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A). This sentence—in the middle of the applicable guidelines

8

range—reflects the serious nature of this offense and agreed-to conduct in the Statement of Offense, ECF No. 22, the defendant's criminal history and characteristics, and provides adequate deterrence to others in the community—particularly given the danger presented by the carrying of loaded firearms with machine gun capabilities.

### *The Nature and Circumstances of the Offense*

The nature and circumstances of this offense are serious and warrant a sentence of 51 months' imprisonment.  As a threshold matter, the defendant's possession of a loaded semi-automatic pistol was an inherently dangerous act that placed the community at risk.  *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence").  Especially in light of the fact that this firearm was equipped with a "giggle switch" or Glock switch—transforming the firearm from semi-automatic to fully automatic.

People carry guns because they intend to use them.  And while the defendant's crime did not result in any direct violence against another, unlawful possession can lead to dangerous consequences, thereby underscoring the need to take such crimes seriously.  This is especially true where, as here, the defendant illegally possessed a Glock 21, .45 caliber semi-automatic firearm loaded with one round in the chamber and an additional 11 rounds in a 13 round capacity magazine equipped with a switch to fully automate this firearm.



*Glock 21 with One Round in the Chamber and 11 Rounds in the 13-Round Capacity Magazine*

The defendant's already dangerous conduct is exacerbated by the fact that his firearm was intentionally modified to make it even more deadly with the addition of the machine gun conversion device. This device enables the firearm to operate as a machinegun. With a single squeeze of the trigger, Brown's gun would spray the 12 loaded rounds almost simultaneously upon anyone who might be in range. These illegal machinegun conversion devices are particularly dangerous because they are not professionally manufactured, and these handguns are not intended to operate as machineguns. Indeed, trained ATF experts can rarely fire such guns accurately.[1] *See* Exhibit A. If Brown were to pull that trigger, the gun would fire all its bullets indiscriminately in different directions. As modified, this was no weapon of self-defense, but a deadly killing weapon.

Notably, there has been an exponential boom in machine gun conversion switches

---

[1] The Government is providing to the Court contemporaneously with this filing a video, marked as Exhibit A, demonstrating an ATF agent test-firing a firearm equipped with a machinegun conversion device.

nationwide. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two, at 4-5 (2023) https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-vii-recommendations/download (noting 570% increase in recovered machine gun conversion parts in 2017 to 2021 compared to 2012 to 2016). Our community has not escaped this alarming trend. Indeed, the dramatic increase in machinegun conversion devices recovered in the past few years alone is frightening. Below are the estimated number of recovered machinegun conversion devices recovered in Washington D.C., according to ATF:

- 2021: 27 Machinegun Conversion Switches Recovered

- 2022: 119 Machinegun Conversion Switches Recovered

- 2023: 195 Machinegun Conversion Switches Recovered

- 2024: 200 Machinegun Conversion Switches Recovered

In other words, there was an over 340% increase in recoveries of machinegun conversion devices in the District from 2021 to 2022. This alarming trend accelerated in 2023 and 2024, with an over 640% increase in recoveries of machinegun conversion devices in the District from 2021 through 2024.

Brown did not securely or safely store the firearm in a gun locker or the car's glove box. This firearm was loosely wrapped in the defendant's sweatshirt found on the seat of the driver side where the defendant had full access at the time the officers arrived. Increasing the likelihood that he, or someone else, would make a rash and fatal decision with that illegal deadly weapon.

## *The History and Characteristics of the Defendant*

The defendant had a tumultuous childhood where he was exposed to drug abuse, physical abuse, neglect, and abandonment at a very young age for an extended period. By his own accord, it led him to "start[] getting into the street," at the young age of thirteen. In all likelihood, these experiences have led to his numerous convictions and arrests set forth in the Presentence Report (PSR). The defendant is now 30 years old with a family for whom he clearly loves and cares about. He deserves credit for his acceptance of responsibility in this case and the government can only hope that he will take advantage of treatment programs and vocational training programs available to him in the Bureau of Prisons.

Although Brown has accepted responsibility for his actions in this case, his unlawful possession of a loaded, semi-automatic pistol with fully automatic capabilities is particularly troubling considering his criminal history as set forth in the PSR on page 7, including *three* previous convictions, all of which involved firearms.

In 2013, Brown was convicted of Attempt to Commit Robbery in D.C. Superior Court in case number 2013 CF3 5179. Brown—as part of a group—robbed three victims. One of the juvenile defendants lifted his shirt to expose a firearm to force the three victims into the woods. Brown and two others met the victims in the woods wearing ski masks to assist in the robbery to which they demanded the victims' shoes and checked their pockets. He was sentenced to a total of 15 months of incarceration with 12 months suspended. He was released in 2014 on supervision which was later revoked. Brown was then incarcerated in 2016 for another 15 months and was not released until 2020.

In his short time on supervised release, Brown was found guilty of Assault with a

Dangerous Weapon, Possession of a Firearm During a Crime of Violence, and Unlawful Possession of a Firearm in D.C. Superior Court in case number 2015 CF3 15338. Brown initiated a verbal altercation with two witnesses where he threatened them. During this altercation, Brown pointed his gun and shot multiple times in the direction of the witnesses causing them to hide behind their car to avoid being shot.

Brown was on supervision at the time of the instant offense for unlawfully possessing a firearm in D.C. Superior Court in case number 2021 CF2 3214 where he served 36 months of incarceration. The police were in active pursuit of a robbery suspect when they observed Brown, who matched the description of the suspect. Brown was stopped and patted down revealing a stolen, loaded, Glock 27 semi-automatic handgun.

Brown's criminal history shows that he has continued to have and use firearms even when he knew he was not allowed to. The instant offense is disturbing because this is not the first time that the defendant has been arrested with a firearm while on supervision, and this time the firearm included a switch. His possession of a gun equipped with a switch should raise concern because he has increased his firepower by having the capability to easily convert a semi-automatic gun into fully automatic. The government, therefore, asks the Court to impose a sentence severe enough to deter him from a continued escalation of his criminal conduct.

### *The Need for the Sentence Imposed*

The requested sentence of 51 months incarceration is sufficient but no greater than necessary to meet the goals of sentencing. Given Brown's criminal history and proclivity towards violence, the requested sentence provides specific deterrence—keep our community safe from Brown for a period of time.

His flagrant and repeated criminal conduct while on supervision has abundantly demonstrated that his prior sentences and court supervision did not adequately deter him from returning to his life of crime. Moreover, as noted above, this is not Brown's first time illegally carrying a firearm. The fact that Brown previously has been convicted of numerous felonies involving firearms is evidence that his past lengthy criminal sentences have not adequately deterred his criminal conduct and shows that a substantial prison term is necessary to deter the defendant from unlawfully possessing firearms in the future. See, e. g., *United States v. Guzman-Najera*, 440 Fed. Appx. 391 (5th Cir. 2011) (court held that repeating conduct after serving time for the same conduct "suggests that a stricter sentence was appropriate to discourage future offenses and encourage respect for the law").

A lengthier sentence will also provide the defendant yet another opportunity to reflect on the serious nature of his crimes, commit to reforming his conduct, participate in Bureau of Prisons programming including those recommended in the PSR, and—most importantly—re-enter as a contributing and lawful member of the community.

A lengthy sentence also provides general deterrence: it will signal to the community that the possession of firearms, including those equipped with a machine gun conversion device, is a serious offense. As laid out above, the rise of machine gun conversions since 2021 has been meteoric. A lengthy term of incarceration in cases where switches are used will deter others in the community from utilizing similar devices.

14

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 51 months incarceration followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By: /s/ *Haley M. Pennington*
HALEY M. PENNINGTON
Special Assistant United States Attorney
Illinois Bar No. 6349612
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-740-4684
Email: haley.pennington2@usdoj.gov

15